UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MHA, LLC,<br><br>                               Plaintiff,<br><br>              v.<br><br>AMERIGROUP CORPORATION, AMERIGROUP NEW JERSEY, INC., d/b/a AMERIGROUP COMMUNITY CARE, ABC COMPANIES 1–100, and JOHN DOES 1–100<br><br>                              Defendants. | Civ. No. 2:18-cv-16042 (KM)(JAD)<br><br>OPINION |

**MCNULTY, U.S.D.J.:**

Before the Court are the submissions of the parties in response to my order to show cause why this case should not be remanded. (DE 41.) I requested that the parties address whether defendants could properly invoke jurisdiction under the Officer Removal Statute, 28 U.S.C. § 1442(a)(1), because federal question jurisdiction appears doubtful in light of *MHA, LLC v. Healthfirst, Inc.*, 629 F. App'x 409 (3d Cir. 2015), (*id.*)[1] For the reasons described below, I conclude that I have jurisdiction over this case.

**I. Background**[2]

---

[1] The parties have additionally submitted arguments in favor and against federal question jurisdiction. Because I find that I have jurisdiction pursuant to the Officer Removal Statute, I will not address this issue.

[2] Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

    "DE" = Docket entry number in this case.

    "Compl."    =    Complaint (DE 1-1)

    "Notice"    =    Amerigroup's Notice of Removal (DE 1)

    "MTD"    =    Amerigroup's Motion to Dismiss (DE 6-1)

1

### a. Facts

Plaintiff MHA, LLC, ("MHA") is a New Jersey LLC which previously owned Meadowlands Hospital, a licensed general acute care hospital with a 230-bed capacity. (Compl. ¶ 10.) MHA sold the hospital, but continues to retain all of its accounts receivable, including monetary claims for unpaid services. (*Id.* ¶ 9.)

Defendant Amerigroup New Jersey, Inc., d/b/a Amerigroup Community Care (together with its parent company, Amerigroup Corporation, "Amerigroup") is a managed care organization ("MCO") which offers Medicaid and Medicare managed health care services through a New Jersey FamilyCare[3] program. (*Id.* ¶ 11–12.) Amerigroup provides access to publicly funded healthcare for New Jersey Medicare enrollees via a Medicare Advantage Plan. Pursuant to a contract with the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), Amerigroup administers Medicare Advantage plans on CMS's behalf. 42 U.S.C. §§ 1395w-27, 1395w-27a.

Medicare is broken into four parts: A, B, C, and D. Part A provides inpatient and hospital coverage, Part B provides outpatient and medical coverage, Part C offers an alternate way to receive Medicare benefits through a private insurer, and Part D provides prescription drug coverage. *What's Medicare?*, Medicare.gov, The Official U.S. Government Site for Medicare, https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare (last visited January 20, 2021). Parts A and B are

---

"MTD Opp." = MHA's Opposition to Amerigroup's Motion to Dismiss (DE 22)

"Response" = Amerigroup's Response to the Court's Order to Show Cause (DE 45)

"Opp." = MHA's Opposition to Amerigroup's Response (DE 46)

"Reply" = Amerigroup's Reply Memorandum of Law (DE 47)

3 New Jersey FamilyCare is New Jersey's idiosyncratic publicly funded health insurance program which includes CHIP, Medicaid, and Medicaid expansion populations. (Compl. ¶ 13.)

together known as "Traditional Medicare" or "fee-for-service," in which the government pays providers directly for the healthcare services they provide to enrollees. *The Parts of Medicare (A, B, C, D)*, Medicare Interactive, Medicare Rights Center, https://www.medicareinteractive.org/get-answers/medicare-basics/medicare-coverage-overview/original-medicare (last visited January 20, 2021). Part C, which is also known as Medicare Advantage, is where Amerigroup comes in. Part C functions as a private alternative to Medicare Part A and B, in which an organization like Amerigroup receives a capitation fee from the government and then uses that money to pay providers for covered services rendered to individuals enrolled in its Medicare Advantage plan. (Compl. ¶ 63); *The Parts of Medicare (A, B, C, D)*. Enrollees still pay Medicare premiums to the government, but that money, instead of being paid by the government to providers, is paid to the MCO, which then pays providers according to its own reimbursement plan. *The Parts of Medicare (A, B, C, D)*.

MCOs have a great deal of autonomy in how they structure their provision of benefits. For instance, they have "free rein" to decide the network of providers with whom they contract, 42 C.F.R. § 422.4, the benefits they provide beyond traditional Medicare, *id.* § 422.102(b), the out-of-pocket costs they may charge enrollees, *id.* § 422.111(f)(5), and the care that enrollees can obtain from out-of-network providers, *id.*

They are, however, limited by a number of rules. Medicare regulations set out a basic set of benefits which MCOs must cover, and obligate them to reimburse providers and suppliers with whom they have not contracted under certain circumstances. 42 C.F.R. § 422.100(a)–(b). MCOs are obligated to comply with CMS's national coverage determinations, general coverage guidelines set out in Medicare manuals and instructions, and written coverage decisions of local Medicare contractors with jurisdiction for claims in the relevant geographic area. 42 C.F.R. §§ 422.101(b), 405.1060. CMS reviews and approves MCO benefit and cost sharing plans, 42 C.F.R. § 422.100(f), and can limit the cost of certain services to ensure that they do not exceed the cost

sharing under Original Medicare, *id.* § 422.100(j). If the government determines that an MCO has committed any of a number of violations, including failing to substantially provide medically necessary items, imposing premiums in excess of certain limits, or expelling enrollees in violation of the Medicare laws, the government is empowered to impose penalties, suspend the MCO's authority to enroll individuals, or suspend payments to the MCO. 42 U.S.C. § 1395w-27(g).

The theory behind the creation of Medicare Advantage is that private companies like Amerigroup might be able to administer Medicare benefits in a cheaper and more efficient manner than the federal government. *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, 685 F.3d 353, 363 (3d Cir. 2012). The hope was that such organizations would be able to innovate in order to "contain costs and expand healthcare delivery options," thereby allowing Medicare recipients to receive greater benefits at an equal or lesser cost to the government. *Id.*

### b. Procedural History

MHA filed a Complaint in the Superior Court of New Jersey, Law Division, Hudson County on May 25, 2018, alleging that Amerigroup had downgraded and underpaid for services MHA's hospital rendered to Amerigroup clients. (Compl. at 2.) Specifically, MHA alleged (1) violations of New Jersey regulations governing payment for emergency services rendered by non-participating providers; (2) violations of the New Jersey Healthcare Information Networks and Technologies Act and Healthcare Claims Authorization, Processing and Payment Act; (3) fraudulent and negligent misrepresentation; (4) unjust enrichment and quantum meruit; (5) breach of a network agreement; and (6) a third-party beneficiary claim. (Compl. ¶¶ 94–173.) MHA in part seeks to recover payments for medical claims under Amerigroup's Medicare Advantage health plan; for instance, it alleges that there were "a number of patients which MHA treated that were covered by Amerigroup in the form of a Medicare Advantage plan that Amerigroup likewise failed to adequately pay for services rendered by the plaintiff, MHA during the out-of-network period" and "patients that MHA treated that were covered by Amerigroup either in the form

of a Medicare Advantage plan or as a Medicaid recipient whose benefits were to be administered pursuant to a Network Agreement during the in-network period and were properly adjudicated under New Jersey law." (*Id.* ¶¶ 25–26.)

Amerigroup removed the matter to this Court on November 12, 2018, (DE 1), asserting that there was jurisdiction under 28 U.S.C. § 1442(a)(1) (the "Officer Removal Statute") and 28 U.S.C. § 1331 (federal question jurisdiction). In the notice of removal, Amerigroup asserted that it was entitled to jurisdiction under the Officer Removal Statute due to its participation in the Medicare program as a government contractor. (Notice ¶ 17.) I concluded that federal question jurisdiction was doubtful in light of *MHA, LLC v. Healthfirst, Inc.*, 629 F. App'x 409 (3d Cir. 2015), and requested briefing on the issue of federal officer jurisdiction.

## II. Discussion

Amerigroup argues that it satisfies the elements of the Officer Removal Statute. I agree.

### A. Removal Statute

The relevant portion of the Officer Removal Statute provides:

(a) A civil action … that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

"[The Officer Removal Statute] is an exception to the well-pleaded complaint rule, under which (absent diversity) a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." *In re Commonwealth's Motion to Appoint Counsel*

5

*Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (quotation and citation omitted) ("*Defender*"). Under this section, "a colorable federal defense is sufficient to confer federal jurisdiction." *Id.*

The Third Circuit draws a distinction between removal under § 1441, which is "to be strictly construed against removal and all doubts should be resolved in favor of remand," *Boyer v. Snap–On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (quotation and citation omitted), and the Officer Removal Statute, which is to be "broadly construed," *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994); *see Defender*, 790 F.3d at 467. Still, "[that] broad language is not limitless. And a liberal construction nonetheless can find limits in a text's language, context, history, and purposes." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

### B. The Third Circuit's Decisions in *Papp* and *Defender*

In order to establish a proper basis for removal under the Officer Removal Statute, the removing party must show that "(1) it is a 'person' within the meaning of the statute; (2) the [plaintiff's] claims are based upon the [removing party's] conduct 'acting under' the United States, its agencies, or its officers; (3) the [plaintiff's] claims against it are 'for, or relating to' an act under color of federal office; and (4) it raises a colorable federal defense to the [plaintiff's] claims." *Defender*, 790 F.3d at 467.

The Third Circuit recently considered the application of the Officer Removal Statute in *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016). There, the Court considered the status of The Boeing Company ("Boeing"), which faced a suit arising out of its use of asbestos in the production of military aircraft. *Id.* at 809. Boeing claimed that it was a government contractor when it used asbestos and thus was entitled to federal jurisdiction under the Officer Removal Statute. *Id.* The Court first concluded that Boeing was a person because § 1 of Title I of the United States Code defines "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *Id.* at 812.

Second, the Court considered whether Boeing had been "acting under" a federal officer or agency. It concluded that requirement is "'to be liberally construed' to cover actions that involve 'an effort to *assist*, or to help *carry out*, the federal supervisor's duties or tasks.'" *Id.* at 812 (quoting *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)); *see also Defender*, 790 F.3d at 468. It noted that "[t]he classic case of such assistance as it relates to government contractors is when 'the private contractor acted under a federal officer or agency because the contractors 'helped the Government to produce an item that it need[ed].'" *Id.* at 812 (quoting *Defender*, 790 F.3d at 468). Thus, "[w]hen . . . 'the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete,' that contractor is 'acting under' the authority of a federal officer." *Id.* at 812 (quoting *Ruppel*, 701 F.3d at 1181). It specifically rejected the notion that a contractor is only "acting under" a federal officer if the conduct in question "was done at the specific behest of the federal officer or agency." *Id.* at 813. The Court concluded that Boeing, by producing military aircraft that the government needed, and which the government otherwise would have been required to produce on its own, had "act[ed] under" the federal government and so "easily satisfies" that requirement. *Id.*

Third, the Court considered the "for, or relating to" requirement, sometimes referred to as the "nexus" or "causation" requirement. *Id.* The Court noted that Congress had revised the Officer Removal Statute in 2011 to "broaden the universe of acts that enable Federal officers to remove [suits] to Federal Court," *id.* (quoting H.R. Rep. No. 112-17, pt. 1, at 6 (2011)), and so concluded that the only requirement to meet this condition was that "there [is] a connection or association between the act in question and the federal office." *Id.* (quoting *Defender*, 790 F.3d at 471). The Court found that there was a connection because the "heart of Papp's claim" was "the failure to provide sufficient warning about the dangers of asbestos in the landing gear of the C-47 aircraft" and that Boeing had sufficiently alleged in its notice of removal that

7

the federal government's control over the C-47 manufacturing process "extended to 'the content of written materials and warnings associated with such aircraft.'" *Id.*

Fourth, and last, the Court found that Boeing had raised a "colorable federal defense" of the "military contractor defense," concluding that undisputed facts from the notice of removal established a prima facie case and Boeing "needed only show that its asserted [defense] was 'colorable,' which is to say that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law." *Id.* at 814–15 (quoting *Colorable Claim*, Black's Law Dictionary (10th ed. 2014)); *see also Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 782–83 (E.D. Pa. 2010) ("[A] defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial.").

Before *Papp*, the Third Circuit decided *Defender*, where it considered whether a Federal Community Defender office was entitled to federal jurisdiction pursuant to the Officer Removal Statute. The Criminal Justice Act, 18 U.S.C. § 3006A, permits the establishment of an independent nonprofit, a Community Defender Organization, to provide defense counsel services to the indigent in a region in lieu of such counsel being provided by the Federal Public Defender. *Defender*, 790 F.3d at 462. The Community Defender Organization is funded via a grant from the government, which is paid pursuant to an agreement "under the supervision of the Director of the Administrative Office of the United States Courts." 18 U.S.C. § 3006A(g)(2)(B)(ii). The Community Defender Organization must submit an annual report setting forth its activities, financial position, and anticipated caseload and expenses for the next fiscal year. 18 U.S.C. § 3006A(g)(2)(B). It is furthermore audited by the Administrative Office of the United States Courts every year pursuant to the comprehensive regulatory framework for administering the Criminal Justice Act, the *Guide to Judiciary Policy*, Vol. 7,

Part A (*Guide*). The Community Defender Organization must adopt bylaws consistent with the rules of representation under the Criminal Justice Act and a model code of conduct, *Guide* § Vol. 7A, Ch. 420.20(a) & (c).

In *Defender*, a Community Defender Organization in Pennsylvania was representing criminal defendants in state habeas proceedings. 790 F.3d at 461–64. That representation arguably went beyond the organization's mandate under the Criminal Justice Act, which usually requires that federal district court must appoint federal counsel to represent a defendant in state proceedings. *Id.* The Commonwealth of Pennsylvania sought to disqualify the Federal Community Defender counsel and the Community Defender Organization moved to remove to federal court. *Id.* at 464–65.

In finding that the Community Defender Organization was entitled to federal jurisdiction, the Third Circuit concluded that it "act[s] under" the AO. *Id.* at 469. It noted that the Community Defender Organization is delegated authority to provide representation under the Criminal Justice Act, and is required under the *Guide* to adopt codes of conduct similar to those of Federal Public Defender Organizations. *Id.* It further noted that the Community Defender "assists" and helps the AO "carry out" its duties of implementing the CJA, and provides a service the federal government would itself otherwise have to provide, namely, the provision of legal representation to the indigent. *Id.* The Court also reasoned that the Commonwealth's complaints related to the "triggering relationship" between the Community Defender and the AO because they targeted the Community Defender's use of federal grant money on representing clients in state habeas proceedings. *Id.*

The *Defender* Court then found that the state habeas proceeding representation "relate[d] to" acts taken under color of federal office because the Commonwealth's complaint asserted that the Community Defender had violated the authority granted to it by the federal government. *Id.* at 472. The Court concluded that the Community Defenders' representation of state prisoners was closely related to its duty to provide effective federal habeas

9

representation, given that proper preservation and effective litigation of claims of error in state court is necessary in order to properly present federal habeas claims. *Id.* at 472.

### C. Analysis

*Papp* and *Defender* guide my analysis here, and counsel that I have jurisdiction pursuant to the Officer Removal Statute.

At the outset, I find that the first prong of the Officer Removal Statute is met here, because Amerigroup is an LLC. *Papp*, 842 F.3d at 812; 1 U.S.C. § 1. I now turn to the remaining requirements.

#### i. "Acting Under"

I find, in agreement with nearly every other court that has considered the issue, that MCOs like Amerigroup are "acting under" the government by providing Medicare Advantage plans. Amerigroup "assist[s]" the government and "help[s] carry out" the government's duty by providing Medicare coverage via Medicare Advantage plans to enrollees. *Id.* at 812; *see also Hepstall v. Humana Health Plan, Inc.*, 2018 WL 4677871 at *2–6 (S.D. Ala. July 3, 2018); *Inchauspe v. Scan Health Plan*, 2018 WL 566790 at *5 (C.D. Cal. Jan. 23, 2018); *Body & Mind*, 2017 WL 653270 at *5; *Assocs. Rehab. Recovery, Inc. v. Humana Med. Plan, Inc.*, 76 F. Supp. 3d 1388, 1391–92 (S.D. Fla. 2014). By providing Medicare Part C coverage and reimbursing providers, Amerigroup helps the government "produce an item that it needs," namely, Medicare coverage for enrollees, by reimbursing providers. *Papp*, 842 F.3d at 812; *Inchauspe*, 2018 WL 566790 at *5; *Body & Mind*, 2017 WL 653270 at *5. In doing so, Amerigroup goes "beyond simply compliance with the law and [instead] helps officers fulfill other basic governmental tasks." *Defender*, 790 F.3d at 468.

MHA argues that Amerigroup is not "acting under" the government, relying on *Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.*, 647 F. App'x 619 (6th Cir. 2016). In that case, the Sixth Circuit concluded that organizations that provide Medicare Advantage plans like Amerigroup are not

entitled to federal jurisdiction pursuant to the Officer Removal Statute. *Id.* at 623–25. The Court concluded that such organizations are not "closely supervised or controlled" by CMS because they have the freedom to design Medicare Advantage plans as they see fit, decide the network of providers with whom they contract, determine the range of benefits they will provide, determine the out-of-pocket costs they will charge, and set the extent of care available from out-of-network providers that they will reimburse. *Id.* The Court also noted that these organizations were not required to regularly update CMS on their enrollees' claims and benefits and that they were required to attempt to resolve benefits disputes before their enrollees could resort to administrative review. *Id.* The Court lastly concluded that these organizations do not perform roles that the government would have to do if it did not contract with private firms, reasoning that if organizations like Amerigroup did not exist, the government would not offer Medicare Advantage plans, but rather simply provide traditional, fee-for-service Medicare, which it must provide regardless. *Id.* at 623–24.

    I will not follow the Sixth Circuit's decision in *Ohio State* for numerous reasons. To begin with, it is an out-of-circuit, unpublished decision, and therefore not binding. *See generally Cellular Tel. Wireless v. Bd. of Adjustment*, 142 F. App'x 111, 115 n.5 (3d Cir. 2005). It is also contrary to the weight of authority. Though *Ohio State* is the only Circuit-level court to have reached the question, district courts outside the Sixth Circuit are essentially unanimous in concluding that organizations like Amerigroup are entitled to federal jurisdiction via the Officer Removal Statute. *See, e.g., Hepstall*, 2018 WL 467781; *Inchauspe*, 2018 WL 566790 at \*5; *Body & Mind*, 2017 WL 653270 at \*5; *Assocs. Rehab. Recovery*, 76 F. Supp. 3d at 1391–92. These courts reason that those organizations perform the government's role of providing Medicare, are subject to a restrictive regulatory regime through which CMS exerts guidance and control, and that MAO determinations are ultimately subject to review via administrative appeals. *See, e.g., Body & Mind*, 2017 WL 653270 at

11

*5. The principal point of disagreement these courts have with *Ohio State*, however, arises from the Supreme Court's directive in *Watson* that the Officer Removal Statute should be afforded a "broad and liberal construction." 551 U.S. 147. My review of the *Ohio State* decision confirms that the Sixth Circuit did not believe that such a construction was properly applicable to the statute. 647 F. Appx. at 622 (rejecting principle that § 1442 should be liberally construed as applying only to other, narrower officer-removal statutes). The Third Circuit, however, applies the *Watson* broad-construction directive to § 1442, and I am therefore bound to follow that approach. *Papp*, 842 F.3d at 812 (statute receives broad and liberal construction).

In addition, the high threshold requirement of supervision and control applied by *Ohio State* is inconsistent with the Third Circuit's directives in *Defender* and *Papp*. The Third Circuit, unlike the Sixth, has never held that a contractor cannot have a high level of autonomy or that it must be closely supervised or controlled by the federal agency in order to invoke Officer Removal jurisdiction. Indeed, to the extent the Third Circuit has addressed this issue, it has concluded the opposite. In *Defender,* for instance, the Community Defender Organization was required to comply with AO guidelines, submit reports, and undergo yearly audits, but there was no indication that the AO exercised any real control over its day-to-day operations. 790 F.3d at 469. That level of supervision, however, is essentially similar to that which was found *not* adequate to support jurisdiction in *Ohio State.*

Finally, I believe that the Third Circuit's approach to the "government function" issue is inconsistent with *Ohio State's* analysis of whether Amerigroup replaces a government function by providing Medicare Advantage plans. The Third Circuit directs that I consider whether the government is using a federal contractor "to achieve an *end* it would have otherwise used its own agents to complete." *Papp*, 842 F.3d at 812 (emphasis added). The *Ohio State* court, however, focused on the *means* by which the government would achieve its end, reasoning that the government would not provide Medicare

12

Advantage plans in the absence of an organization like Amerigroup, but instead would simply provide traditional Medicare. 647 F. App'x at 623–24. Had the Third Circuit followed the *Ohio State* court's reasoning in *Defender*, it would have concluded that, absent the Community Defender Organization, the government would not have created another similar nonprofit, but would have simply provided legal services directly through the Federal Defender agency. That is not what the Third Circuit concluded, however, because it was focused on the *end* (provision of legal representation), not the *means* (provision of legal representation through a nonprofit).

The government's essential goal here is not the provision of Medicare Advantage Plans as such, but provision of Medicare coverage. It is that essential function that is being discharged through the alternative means of employing Amerigroup. If Amerigroup did not exist, the government presumably would need to step in *via* traditional Medicare. Thus, I conclude that Amerigroup was "acting under" CMS.

### ii.   **"For, or relating to"**

I find that the conduct at issue in this case was "for, or relating to" a federal officer or agency. In order to meet this requirement, Amerigroup need only show that there is "a connection or association between the act in question and the federal office." *Papp*, 842 F.3d at 813 (quoting *Defender*, 790 F.3d at 471). That is plainly the case here: MHA claims that Amerigroup failed to properly pay reimbursements pursuant to its obligations under its contract with CMS.

MHA argues that there must be a causal nexus between the wrongdoing alleged in the complaint and Amerigroup's acting at the direction of a federal authority. (Opp. at 10.) As *Papp* explained, that is no longer the case after the 2011 statutory amendments. 842 F.3d at 813 (acts need not be at behest of federal agency to justify Officer Removal jurisdiction). Thus, I conclude Amerigroup meets this requirement.

### iii. Colorable Federal Defense

Finally, I find that Amerigroup colorably raises federal defenses. As explained in *Papp*, Amerigroup need only show that such defenses could be reasonably asserted, given the existing facts and law, and that those defenses, if sustained, would defeat the plaintiff's claims. 842 F.3d at 814–15. Amerigroup raises a number of defenses, but only one need to be colorable in order to justify invocation of the Officer Removal Statute. *Id.*; (Response at 9–10.)

In its motion to dismiss, Amerigroup invokes a defense of preemption pursuant to the Medicare Advantage statute. The Medicare Advantage statute contains a broad preemption provision which states that its standards supersede any State law or regulations with respect to Medicare Advantage plans offered by organizations authorized by the law. 42 U.S.C. § 1395w-26(b)(3). According to Amerigroup, Medicare regulations both set forth the list of services for which a Medicare Advantage organization must reimburse a provider that has not contracted with the organization, 42 C.F.R. § 422.100(b)(1), and also cap the rate that non-participating providers may lawfully charge, 42 C.F.R. § 422.214(b) (a non-participating hospital "must accept, as payment in full, the amounts . . . that it could collect if the beneficiary were enrolled in original Medicare"). (MTD at 12.) Amerigroup asserts that the First, Third, Fourth, Fifth, Sixth, Seventh, and Eighth counts in MHA's complaint all demand that plaintiff be paid at rates higher than those established in 42 C.F.R. § 422.214(b), and that the Medicare laws preempt any such recovery. (MTD at 12.) Amerigroup also asserts that Medicare regulations govern the timing of the payment of claims, 42 C.F.R. § 422.520, and thus preempt the Second Count in plaintiff's complaint, which seeks damages for Amerigroup's alleged failure to pay reimbursements promptly. (*Id.* at 13.)

In its opposition to Amerigroup's motion to dismiss, MHA claims that it is not seeking damages in excess of the statutory reimbursement rates. (MTD Opp. at 6–7, 9–10.) The complaint, however, nowhere states that the damages sought are limited to Medicare reimbursement rates, (*see* Compl. Wherefore

Clauses at 29, 32, 34, 36, 38–40, 42 (seeking compensatory damages for Counts One and Three through Eight),[4] and indeed at points explicitly seeks fees set by the "usual, customary and reasonable" rate, (*see, e.g., id.* ¶¶ 106, 116, 147 ("The reasonable value of Amerigroup and the other defendants' services is the actual amount of reimbursement due to a provider's [usual, customary and reasonable] charges for each procedure.").)

MHA also raises numerous other matters in defense, including the following: that there is a heightened presumption against preemption in healthcare matters; that its claims do not interfere with Medicare standards; that it does not seek to impose obligations "above and beyond" Medicare standards; and that preemption depends on the facts and thus requires discovery. (MTD Opp. at 5–17.) I do not now offer an opinion on the merits of these arguments except to note that MHA does not cite to any binding precedent which would necessarily rule out a preemption claim in this case.

A preemption defense was raised in *Defender* as well, and there the Third Circuit concluded that such a defense is colorable where "it is plausible" that preemption principles might invalidate the plaintiff's claims. There, the Court of Appeals found it plausible that Congress intended that no entity other than the Judicial Conference and the AO was authorized to monitor and enforce a Community Defender Organization's compliance with grant terms. 790 F.3d at 474. I find Amerigroup's preemption defense to be similarly plausible here; Congress, in stating that the Medicare Advantage statute's rules were not to be displaced by state law, may well have intended to impose limitations on the ability of state actors to impose liability in a way that might interfere with the

---

[4] MHA argues that its unjust enrichment claim seeks only the "difference between the reasonable value of the services MHA provided to Amerigroup's members and the amounts Amerigroup actually paid MHA for those services," which it asserts would be "the amount due under Medicare." (MTD Opp. at 12.) I see the point, which is that the Medicare rate could set the reasonable value of MHA's services. However, that is not the only method of determining the reasonable value of such services, and indeed MHA appears to define its damages for unjust enrichment as the "usual, customary, and reasonable" amount they are due "in accordance with the reimbursement rate(s) paid by other health insurers." (Compl. ¶ 147.)

15

Medicare Advantage scheme, such as by imposing liability in excess of Medicare reimbursement rates.

To be clear, I do not now rule that Amerigroup does of will prevail on its preemption claim. But Amerigroup "need not win [its] case before [it] can have it removed." *Papp*, 842 F.3d at 815 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). I conclude that Amerigroup has raised a colorable federal defense, fulfilling the final requirement for assertion of federal jurisdiction.

### III.   Conclusion

I find that the Officer Removal Statute entitles Amerigroup Bayonne to a federal forum for this action. Because I find that the Officer Removal Statute provides jurisdiction here, I do not reach the issue of Federal Question jurisdiction.

An appropriate Order accompanies this Opinion.

Dated:  January 21, 2021

/s/ Kevin McNulty
_____
**HON. KEVIN MCNULTY, U.S.D.J.**